Our next case on calendar is Panoche Energy v. United States 23-1268. Each side has 20 minutes in this case. Good morning, your honors. May it please the court. Excuse me. I am Tim Hobbs with K&L Gates for the appellant Panoche Energy Center. I'd like to reserve three minutes for rebuttal, please. Panoche challenges the conditions of an underground injection permit issued by EPA. The conditions require Panoche to drill a multimillion-dollar, 4,000-foot-deep monitoring well on property that Panoche does not own or control. This is unprecedented, your honors. While EPA admittedly has broad authority under the Safe Drinking Water Act to require monitoring, what EPA seeks here is unlimited authority to impose monitoring conditions without regard to cost or access to property or the relative value of the information to be obtained. EPA's position conflicts with the governing statute, its own regulations, and its decision is also arbitrary and capricious. The court should vacate the challenge permit conditions. Turning to the agency's statutory authority, EPA contends that its authority to require monitoring, in this case, is implied in section, in 42 U.S. Code 300H-5. That statute first required EPA to amend its regulations to identify monitoring methods for Class I underground injection wells. The statute then instructs EPA to apply those methods wherever appropriate. It is Congress's use of that language that cabins EPA's authority and requires EPA to take the cost, the advantages and disadvantages, into account and weigh them against the benefits to be obtained. This is the teaching of the Supreme Court's decision in Michigan v. EPA. Can I ask you just a preliminary question about that? I had understood from your opening brief that you were arguing that the regulations require consideration of costs, but I did not see an argument that the statute requires cost-benefit balancing until your reply brief. Am I correctly characterizing the briefing? Somewhat, Your Honor, and there's a reason for that progression of Panoche repeatedly questioned EPA's authority to regulate in this manner. EPA never raised the statute, 300H-5, until its answering brief in this case. That statute was not cited in the response to comments that the agency provided. It was not cited before the Environmental Appeals Board. It does not appear in the Environmental Appeals Board decision. So the first time that EPA has said, this is the source of our authority here, was in their answering brief in this case. And so that is why we address this in our reply brief. Our opening brief questioned, you know, what is the agency's authority here? The agency repeatedly said that, well, we have this authority under the Act, but it didn't specify the provision of the Act that gave it that authority. So our opening brief posed that very question. The agency says, we have this authority. We said, where is it? That's when the agency responded with 300H-5. And again, and we would agree, that is the governing provision here for Class I monitoring wells. You weren't taken by surprise that it was 300H-5. Well, we were to some extent, Your Honor, because we questioned the agency's authority, and the agency never came back and said, I want to make sure I understand, the agency's authority to do what? To require a monitoring of groundwater specifically. Wait, do you think they don't have the authority to require groundwater monitoring at all? Or are you just saying they have to consider costs in doing that? Because they definitely have the authority to do groundwater monitoring, don't they? Agreed. Yes, of course they do, Your Honor. There's no dispute about that. So citing 300H-5 really wasn't a surprise to you. It's not like they sneaked up on you. This is obvious. I mean, it's open, it's notorious, right? That they have authority to do monitoring. Now, the question is of the details of the monitoring is open to interpretation and argument. But the fact that they have the authority to do monitoring is not a surprise to you. That is correct, Your Honor. And we've never taken the position that the agency lacks authority to require monitoring. So what is it that you think that 300H-5 does that's different here? What is it that they violated here? So we think that there's an important qualifier in that statute that says that monitoring can be required wherever appropriate. And so we think it's that language. How is the where appropriate different from, let's say, the general APA constraint of arbitrary and capricious? What is more specific about where appropriate than arbitrary and capricious? I think they're very similar inquiries, Your Honor. I mean, I look at the costs. What would it entail to do monitoring in this particular location, right? And then look at the benefits. What are we going to gain if we require that monitoring? And so in this case, for example, the cost. That suggests, I mean, this following on Judge Bybee's point, which I think you acknowledge that appropriate is not really all that different from non-arbitrary. That line of reasoning, I mean, if you concede, has a certain intuitive appeal. But what would entail the consequence that non-arbitrary decision making always requires consideration of costs, which is not the law, right? So what is it about appropriate in this context that you think requires cost considerations? So looking at the legislative history, for example, Congress was aware that these types of monitoring wells may not always be effective. They could miss a plume of fluids migrating into a source of drinking water if they're not located in the proper place. It's very deep underground. It's difficult to monitor in these types of situations. Congress was aware of that. It wanted to give EPA this information about monitoring wells with the recognition that they may not always be appropriate. And so I would have thought that was the argument the other side would make. I mean, that sounds to me like a definition of appropriate that has nothing to do with cost. Like, you shouldn't just dig a well for no reason at all. But if it's going to give you the information you need, then it's appropriate. And that has nothing to do with cost. Yes, Your Honor. But I think that's why we look to Michigan versus EPA, where Congress looked at the use of that word, appropriate, in a different statute, but in a related context of giving the agency the authority to regulate. So here the statute also has the language, earliest possible detection. The goal here is a very safety-specific thing, this earliest possible detection. Doesn't that mean that Congress is basically saying, we want drinking water to be safe and we don't care that much about the cost? I would say that Congress obviously wants drinking water to be safe and gave EPA the authority to make sure that it is. At the same time, when EPA imposes a monitoring condition, there has to be an evaluation of what is it going to cost to get this information and what are we going to get out of it? That is what we are saying the agency did not undertake in this case. So you started your argument today by saying something about multi-million dollars, or maybe you said billion, I'm not sure what you said. But where in the record is the analysis of how much this would cost? Yes, Your Honor. I can give you some specific citations for that. Because I didn't understand that you had actually done a full analysis of how much it would cost and submitted it to the agency. We had given the agency various comments saying, estimating what the cost would be to drill these types of wells. Ultimately, I believe... I took it your principal concern is not the drilling cost, it's that the almond people might charge you an unreasonable amount to go onto their property, right? That's correct. I mean, regardless of the location, you have to drill it. So the drilling cost seems like it's not really the focus of your concern here, right? I think that's part of the concern is the drilling cost. But yes, it's also the property access cost. And because we were required to gain access to a very specific parcel of property, it couldn't be any parcel around, it had to be this particular point on the land. And so... Didn't the agency say if there was some problem with that specific location, you could come back and they would reconsider whether it could be somewhere else? The agency did say that in their briefing, Your Honor. But that's troubling because they wrote it into the permit that we were required to drill at that very particular location and to submit a plan to do so within 60 days of the permit taking effect. What's the alternative for EPA? So if they looked at this and said, gee whiz, this well is not on Penosia's property, it's in the middle of an almond grove, and we don't know whether the owner would cooperate or not. So the alternative is what? To deny the permit? That is an alternative, Your Honor. But that wouldn't seem like that would be in your client's interest, would it? To just have the permit just outright denied? That's correct. I think we would be right back here making similar arguments if that were to have detect a leak of fluids from the injection zone by monitoring the fall-off testing, the modeling that's done, and the fall-off testing that's performed. That can help indicate that there is a leak happening. And in fact, Congress recognized that that type of monitoring may be more effective than groundwater monitoring wells that could easily miss a plume. One of the most disturbing things in this record is the absence of any evidence from Penoche that they've approached the almond grower. That is true. There is nothing in the record on that, Your Honor. We have no idea whether the almond grower would say, gosh, this is a great idea. I'll take out an almond tree and you can drill right here. My understanding is that Penoche has approached the almond grower but does not have any answer as to whether or not that would be permissible. I mean, if somebody came to me and asked me to drill this monitoring well in my backyard, it's a very – it's a big process. It requires a lot of equipment, a lot of drill pipes, hundreds of thousands of pounds of smudges. The diameter of the drilling point itself is fairly small, right? I understand it's going to take some big equipment. Sure. Yeah, the well itself is not that large, but it takes massive equipment to drill almost a mile around. And again, the alternative for the almond grower in looking at this situation is that he may lose a source of power if the permit is denied. I mean, there's – you've – it seems like there's some room for negotiation here. And the record reflects, so far as we can tell, that there hasn't been any effort whatsoever. We have no idea what the cost is going to be. That's correct, Your Honor. And do you think EPA was responsible – do you think EPA had the burden of approaching the almond grower to find out to negotiate this? Well, I think what typically happens in these types of permits is that there's a negotiation between the permittee and the government to say, okay, the government says, here's what we want. The permittee says, well, here's what we can provide. Let us go see what we can do. Let us propose a monitoring plan for the government to approve. And then typically that's what gets written into this permit. In this case, those negotiations broke down. The agency insisted that they wanted this specific monitoring well at this specific location. You're talking about negotiations between EPA and Pinoche. Correct. I'm referring to negotiations between Pinoche and the almond grower. Yes, Your Honor. This record is absolutely silent. It doesn't appear that there's been, as far as we can tell, that there's been any effort whatsoever. In the record, you are correct, Your Honor. There is no indication of communication. So my question was, you're arguing here about costs and benefits. Was it EPA's burden to go to the almond grower, or was that Pinoche's burden? I think— Did Pinoche want EPA negotiating for it? There was some question, I believe, at some point of, you know, maybe it would be beneficial if the agency would go to the almond grower to explain why this was being required at this specific property. I think Pinoche's concern with going to the almond grower is, you know, being— I mean, what if the almond grower said, sure, you can drill here for $100 million or just said no? Then you could go to EPA and say the cost of this is $100 million. But right now you're coming to us saying EPA should have considered specific costs that involved costs you needed to assess that you never told them what they were. But I think that's why—you know, that's typically part of the negotiation that happens before the permit gets granted. Here EPA went ahead and issued the permit anyway and said go do it. And so if we are not able to satisfy that condition, then Pinoche is out of compliance with its permit and risks being shut down. But, counsel, I mean, all of this just feels really backwards because if EPA comes in and says, gee, the place that you need to do—that we need to do the monitoring, that we think would be best for the monitoring is not on your property, so we're simply going to deny the permit, in which case it would be very—seems like it would be very profitable for your company to come back and say, wait up just a minute, why don't we see if we can negotiate this with the almond grower and negotiate with this EPA over us monitoring this at Silver Creek? And that would put you right exactly where you are, which would be a very—seems like a very reasonable position. Yes, Your Honor, but I think from Pinoche's perspective, it offered some alternatives, and EPA did not seem interested in any of those alternatives and insisted on this one particular well. Well, they started with three wells, and you did negotiate, and they went down to one, and then it seems like they also said—I mean, if you think this isn't accurate, you can tell us, but it seems like they also said if it actually doesn't work out, we'll talk to you more about whether it should be a different location. They did say that, Your Honor, but that was after the context of permit issuance. And so then EPA did not address, well, what happens if the cost from the almond grower is too high? What happens if the almond grower says no? At that point, Pinoche would be out of compliance with its permit, and that is not something that Pinoche was willing to risk. Well, what is the situation right now? Are you out of compliance with the permit right now? No, the permit condition has been stayed pending judicial review of that condition. And if you lose here, are you immediately out of compliance with the permit, or what happens? Well, the permit would take effect, and then Pinoche would be required, I think, you know, it's within 60 days to submit a plan to start drilling the monitoring well. Which means you'd have to go over and talk to the almond grower, and if he's not cooperative, then you have to come back to EPA and ask for a modification. That's correct, Your Honor, but again, at that point, we would potentially be out of compliance with the permit and resting on EPA's prosecutorial discretion not to take an enforcement action against Pinoche for not being able to fulfill this condition. So it puts Pinoche in a bind there. Is this issue even ripe? Like, can we resolve this without knowing whether the almond grower is going to let you drill this well? We think you can, Your Honor. We think that what EPA should have done here is, you know, actually get those costs, look at the cost of drilling the well, look at the environmental risks of also drilling the well. I mean, it's not cost-free from an environmental perspective to drill this well. EPA said none of those things are relevant at all to its consideration. So what we're saying is that the statute required the agency to take all of the negative things into account when determining whether or not to require this monitoring well, and that's what the agency did not do and what they should have done. Let me also turn to the reasons why we contend that the decision that EPA made here is arbitrary and capricious. To begin with, the EPA's decision here lacks substantial evidence. This entire case boils down to the contention by EPA that drilling muds that were used to plug and seal the Silver Creek 18 well in 1974 can fail with age. That is why the agency rejected the modeling that Pinoche performed to show that there would be no problems with these abandoned wells, because the agency had this one concern that the muds were just too old. The problem is that there is no evidence in the record that drilling muds actually fail with age. There's not one single example that the EPA has pointed to to say, look at this well over here, this happened, these muds failed, and fluids were allowed to move from the injection zone into a source of drinking water. The one study that the EPA cites to, which we call the Utah study for a shorthand in the briefing, is about a different geographic region, and it speculated about potential causes of the salination of an aquifer in that area. It cited no studies that drilling muds fail with age. It did not actually find any drilling muds failing with age in that case. You're going to run out of time, so can I ask a question? Yes, Your Honor. Let's say you lose on the first issue, and we think that the agency either adequately considered the costs or doesn't need to consider the costs. What about the statute or the regulation or anything says that EPA can't require a monitoring well to learn about mud and how it works better than we have? Like if there's just no information, like you're saying there's no information, they fail. But what if the EPA is like, okay, well, we better figure out whether mud ever fails, so let's have this well get built. Is there any reason that they can't do that? Yes, so we would point the court to the regulations at 146.13d, which requires a site-specific assessment of the potential for fluid movement and the potential value in monitoring to learn about that fluid movement. So there has to be a determination that there is some potential for fluids actually to move. Here, what we're saying is there was no potential for fluid movement. We understand you're saying that, but if they think we really don't know, and this is all this drinking water, so we really want to dig one well just to make sure and find out what's going on with this mud. And if the agency had a substantial basis for that concern, then they would be correct in asking for that. But here, that concern was based on pure speculation and not evidence. So there was not substantial evidence in the record to support the fundamental concern that they had, and that's why they rejected a monitor. And we would have a very deferential standard of review in figuring out whether the agency scientifically – it's basically a lack of evidence. So if they think there's just not that much evidence, we need to learn about this, we need to dig a hole to figure it out. You're saying there's no evidence, but that's kind of the premise. It seems like they have a lot of scientific ability to say we don't have enough information, don't they? Obviously, the agency has the authority to pick and choose from among competing studies that might say different things. This is not that case, though. This is a case where there is not a single study that supports the concern that the agency had. But are there lots of studies that say there is definitely no concern? Well, Panosh did put information in the record to say that actually drilling these muds that are used to plug these abandoned wells improve with age. They get heavier, and the gel strength increases. So there actually was counter evidence to show that their concern was unfounded. But the problem here is that the agency never came forward with its own study to say here's the source of our concern. There isn't anything out there to support that. I see I'm out of time. I'll still give you two minutes for rebuttal, but let's hear from the other side. Are there two – yeah, just the other side now. This is just two to the counsel here. Good morning, Your Honors. May it please the court. My name is Paul Cirino, appearing for Respondent, U.S. Environmental Protection Agency. I'm joined today by Deshawn Garnett of EPA's Regional Counsel's Office. The Safe Drinking Water Act was enacted to protect our country's drinking water sources from contamination. And those diminishing underground sources of drinking water are our nation's natural treasures because they can provide potable water for an entire community for decades. Congress directed EPA to establish a program to prevent underground injection that endangers drinking water sources. And a permit applicant may not inject unless and until that applicant satisfies its burden of showing that the proposed injection will not allow the movement of contaminated fluid into an underground source of drinking water. In this case, EPA was presented with the situation where the petitioner wanted to inject millions of gallons of wastewater containing high amounts of total dissolved solids and chloride into the lower aquifer known as the injection zone. The injection zone here is already naturally over-pressurized. And so any additional fluid injected will only increase the pressure. And the more pressure, the more movement of water and fluids within that formation. And here, the groundwater direction is towards the east. Situated a mile and a quarter away from petitioner's four injection wells is an abandoned gas mine known as Silver Creek 18. And that's one of 12 abandoned gas wells within the zone of review. And the abandoned well that is closest to petitioner's injection wells. And given the geology that I've described, the proximity of Silver Creek 18 to petitioner's injection wells was of significant concern to EPA for various reasons. First, the well was decommissioned 50 years ago in 1974. The well had no long string casing. The well had no cement plug between the injection zone and the underground source of drinking water. And the well had lighter weight drilling mud that was less resistant to pressure than heavier and more viscous drilling muds. And referencing Silver Creek 18, petitioner's own permit application raised the valid concern that fluids in the injection zone have the potential to migrate towards Silver Creek 18. And which would serve as a conduit to the underground source of drinking water. I'll quote. Could I ask you to, this is switching gears slightly, but to address petitioner's argument that 164.13D1 requires consideration of costs? Right. Well, that regulation doesn't say anything about costs or a cost-benefit analysis. Well, it says you're supposed to, it uses the word value, right? It does. And, I mean, so in some context, it seems like that does call for cost-benefit balancing, right? If I ask you for a recommendation about a car and you say, well, you know, I think the Toyota is the best value, right? That doesn't mean it's the best car or the cheapest car, but it means, you know, balancing, you know, what you get for what you would pay. It's the best. So why is this not a context in which value has a similar meaning? Well, you'd have to read the whole sentence, Your Honor. The context is that it's the potential value of monitoring wells to detect fluid movement from the injection zone. So it's focused on the information that the agency would receive to undertake that analysis. It was in your view, I mean, suppose that there's a situation where there's two different places where you could require somebody to drill a well. One of them, you know, is what will provide marginally better information, you know, because of the geology, right? It is slightly better in terms of the information you would get, but would cost millions of dollars more than the other one. You think EPA is required to pick the more expensive, higher information well? Has discretion to do that, or what do you think the regulation calls for there? Yeah, I think the agency has discretion. I mean, part of that same regulation requires a site-specific assessment. So you're going to look at all the factors, the geology, the information to be gathered, the effect on detecting. But is cost, when you say all of the factors, is cost one of those? I don't think it's required here, because I think, again, this regulation is focused on gathering information to understand potential for fluid migration. In my hypothetical where you have the, you know, one gives you more information, you know, slightly more information, but is way more costly. If cost is not a valid consideration, it seems like the agency would be required to pick the costlier one. I think, I don't know that, I think it can consider multiple factors, and I don't think it would be erroneous for the court to consider cost, but I don't think it's required to. Well, but, I mean, if it has the discretion to consider cost, then doesn't it need to give some non-arbitrary reason if it's not going to in a particular case? If it's a factor that warrants consideration, I think the agency should address it. But here, Your Honor, whether it's required or not, the agency did consider the cost issues as raised by petitioner. In addition to the negotiations with, or the permit development with petitioner, where the monitoring wells were reduced from three of two depths to one of a single depth, were in part responsive to their concerns about costs and burdens. And EPA, if you look at the response to comment number three on page 3-ER616, they specifically addressed the issue of cost. So here, that's been done. So I think if the court were to consider cost to be a relevant factor in the agency's consideration of the monitoring issue, it did consider that factor, as well as the other relevant factors. So when we just heard from your friend on the other side that the concern that if they try to come back to you and say, you know, we've gone to the almond grower and it turns out it's really expensive or they won't let us in, that while you think about that, they would then be out of compliance with the permit. Is that description correct? Well, I think EPA's position is that if this monitoring well location is inaccessible to the petitioner, EPA is open to other alternatives. But what happens in the meantime? I mean, like, so the stay, so we rule in your favor, I suppose, and then I guess the permit condition has been stayed, so the stay would no longer be in place. And then they come to you and they say, well, we can't drill there, but now they're out of compliance. So what happens? I don't want to get ahead of the agency and what it would do or what it would consider, but, you know, hopefully we'll be more optimistic and the access will be granted and the well construction can be proposed within 60 days and then begin 120 days after that. I do want to return to the question of, because my friend had mentioned there was nothing in the record that raised the specter that the migration of fluids could reach Silver Creek 18 and then go up into the underground source of drinking water, but their own permit application stated that the potential exists for pressure to enter the wellbore, Silver Creek 18, and move fluids to the underground source of drinking water. That's their own application. The potential exists. So EPA properly asked Petitioner for more information about the strength of the mud in Silver Creek 18, particularly in the area between the injection zone and the underground source of drinking water, and EPA in particular requested site-specific empirical data. And Petitioner did not produce any site-specific empirical data, and in the absence of the information, EPA required Petitioner to construct a single well at the base of the underground source of drinking water near Silver Creek 18. And the purpose of the well is to sample water quality and measure formation pressure. The information will give EPA a baseline initially of what the conditions are, and then as information is received, the agency will be able to evaluate trends and see whether indeed fluids are migrating to the underground source of drinking water. So I'd ask the courts to uphold EPA's decision. So I know you are arguing that you don't have to consider costs, but I think you're also arguing that in any event you did consider costs? Yes, Your Honor. And is that mostly about going from three wells to one, or can you elaborate a little bit? Sure. The Petitioner submitted a comment regarding costs. It's comment number three. Sorry, it's comment number six. I apologize. And it laid out that a monitoring well would cost at least $1.6 million. EPA responded to that in three paragraphs. Your Honor was correct. There is no additional documentation, breakdowns, or support for any figure regarding the cost of a monitoring well or access for that matter. So whatever was relevant to cost in the record, EPA specifically addressed it on page 3-ER-0615. So, Your Honor, I think I've addressed the principal arguments raised by Petitioner and explained the basis for EPA's decision. I know I have additional time, but if Your Honors have no further questions, for the reasons I've stated as well as the arguments set forth in EPA's answering brief, the Court should deny this petition for review. In addition, the Court should vacate the stay so that these important monitoring provisions of the permit can take effect as soon as possible. Thank you. Let's give two minutes for rebuttal. Thank you, Your Honors. My colleague here referenced the geology of this particular site, and that is one other reason why we contend that the decision made here was arbitrary and capricious. EPA has never addressed Penoche's contention that there is a buffer aquifer at this particular site that would address the concerns of fluids migrating from the injection zone into underground sources of drinking water. EPA recognized in 1998 that buffer aquifers act as pressure bleed-off zones and thus provide an additional safeguard to prevent fluids from migrating from the injection zone above. Penoche raised this in its comments on the draft permit. The EPA did not respond to that comment in its response to comments. It did not respond to the same argument that was made before the Environmental Appeals Board, and it did not respond to the same argument again in its answering brief to this Court. So at this point, Your Honors, it's fair to conclude that EPA has no response, but it is undisputed that there is a buffer aquifer at this particular site. EPA did not take into account the site geology in undertaking its site-specific assessment as to whether or not there would be fluid migration from the injection zone into the underground sources of drinking water. The agency simply cannot ignore geological evidence that undercuts its decision, particularly when that evidence bears directly on the potential for fluid movement, which is what their regulation is designed to address.  EPA acknowledged that even if the Silver Creek 18 well was a source of leakage, that the water quality may or may not change as a result. Well, that begs the question of, well, what are we monitoring for? That would suggest that if Penoche detects a change in water quality, it may or may not be due to Silver Creek 18 leaking. Conversely, if Penoche detects no change in water quality, that still doesn't give us any indication that Silver Creek 18 is not leaking. So the point here is that the value of the information to be gained from the monitoring is extremely low. It's unreliable and doesn't tell us anything definitive about fluid movement from the injection zone to the underground source of drinking water. At the same time, the cost to get that information is extremely high, millions of dollars. Access to property that Penoche does not have. And so what we're saying, Your Honors, is that the agency should have balanced those things in reaching its conclusion. Thank you. Thank you, both sides. This case is submitted.
judges: BYBEE, FRIEDLAND, MILLER